**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Herman PATAYAN SORIANO,
Defendant–Appellant.**

No. 01–50461.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 16, 2003.

Filed Oct. 15, 2003.

Amended March 11, 2004.

Jeffrey H. Rutherford, Deputy Federal Public Defender, Los Angeles, CA, for the defendant-appellant.

Adam D. Kamenstein, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before: TASHIMA, BERZON, and CLIFTON, Circuit Judges.

Opinion by Judge CLIFTON; Dissent by Judge BERZON

### ORDER

CLIFTON, Circuit Judge.

The opinion and the dissenting opinion filed October 15, 2003, and published at

346 F.3d 963 (9th Cir.2003), are amended as follows:

The opinion is amended by adding a new footnote 4, 346 F.3d at 975, at the end of the first sentence of the concluding paragraph: "For the foregoing reasons, we affirm the denial of Soriano's motion to suppress, and thus affirm his conviction.[4]"

> 4. After the initial publication of the opinions in this case and during our court's consideration of Soriano's petition for rehearing en banc, Judge Berzon amended her dissenting opinion, notably to shift the basis of her dissent from a conclusion that the district court had committed "clear error" in its factual findings to an assertion that it had committed certain "legal errors." At this stage we are not inclined to redraft our majority opinion to respond in a more comprehensive fashion, but instead will simply state that we disagree with her analysis.

We feel compelled to note, however, that we believe that the dissenting opinion, as amended, contains significant misstatements, particularly in its second paragraph, newly added to the dissent as part of the amendment. In broad terms, we do not believe we made the assumption or drew the conclusion attributed to us in that paragraph. More specifically, the dissent incorrectly asserts that there was "a finding that impermissibly coercive *statements* [plural] occurred." *Infra* at —— (emphasis added). There was no such finding, and there is no basis for asserting that there was any more than a *single* statement identified by the district court as a source of concern, that being the statement by Officer Shanahan, which was immediately followed by corrective statements by Postal Inspector Callas. Nor was there a finding, as the dissent asserts, that Shanahan's statement" *did* impact the decision to consent." *Id.* (emphasis in original). The district court found that Mukai did have her concern for her children "in mind to

some extent," but that is not quite the same thing, and not a finding that Mukai's consent resulted from Shanahan's threat. The district court considered the entire context, including the statements made by the other officers correcting Shanahan's statement and the fact that Mukai took time to think before giving consent.

Finally, there was no conclusion that "a consent *can become* voluntary *simply* because there was time to deliberate." *Id.* (emphasis added). Mukai's consent did not change from "involuntary" to "voluntary." The district court found, based explicitly on "the totality of circumstances," that Mukai's consent was "free and voluntary." That determination did not rest "simply" on the fact that there was time available for Mukai to think. It was based on the entire collection of facts, one of which was that Mukai actually took the time to deliberate and was not stampeded into consenting immediately following Shanahan's improper statement.

The dissenting opinion is amended by replacing the first paragraph, 346 F.3d at 975, with:

> Faced with conflicting representations by two law enforcement officers, Hiroe Mukai did the only thing that a reasonable parent could have done under the circumstances: She consented to a search for fear that the representation of one of the two officers that her young children would be taken from her if she did not consent would prove correct. The trial court recognized that when signing the consent form Mukai *did* "have [ ] in mind to some extent" her fear that her children would be taken from her if she refused to accede to the officers' demand. Yet, the trial court concluded that Mukai's consent was voluntary.

In affirming the district court's decision, the majority ratifies at least two unacknowledged legal errors: first, the assumption that where there is a finding that impermissibly coercive statements occurred and *did* impact the decision to consent, as here, the decision can nonetheless be voluntary even if the reliance on the coercive statements was reasonable; and second, the conclusion that a consent can become voluntary simply because there was time to deliberate concerning whether to rely on impermissibly coercive statements.

At the outset, I note that although the ultimate question whether Mukai's consent was voluntary is a factual one, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the trial court's errors, described above, involved the application of the legal standards for voluntariness of consent. *See Culombe v. Connecticut*, 367 U.S. 568, 603, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (explaining that the voluntariness inquiry requires "the application ... of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances"); *see also Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041 ("In determining whether a defendant's will was overborne in a particular case," a court must "evaluate[ ] the legal significance of how the accused reacted.") (citing *Culombe*, 367 U.S. at 603, 81 S.Ct. 1860).

Accordingly, I respectfully dissent.

Replace the fourth paragraph (the fourth paragraph on 346 F.3d at 977) with:

*Second*, the district court erred in concluding that a reasonable person would have determinatively credited Inspector Callas' reassurances over Officer Shanahan's threats. True, Callas indicated to Mukai that her arrest was unrelated to her decision regarding consent. Shanahan, however, the only officer in uniform, never recanted her threat and remained standing nearby, presumably within earshot, for the remainder of the conversation.

Replace the second and third full paragraphs (second and third full paragraphs on 346 F.3d at 978–79) with:

In determining otherwise, the district court and the majority posit a model of voluntary decisionmaking that cannot be reconciled with the values underlying the Fourth Amendment. That Mukai "seemed to carefully think the situation through before ultimately signing the consent form," *ante* at ——, or "was told that it was her decision and ... was thinking it over" for either five or ten minutes, as the district court found, has nothing to do with the voluntariness issue. Mukai forcefully testified that the decision she finally made was the result of her fear that Shanahan's prediction concerning her children's fate should she fail to consent could prove true. That she thought for a while before coming to that conclusion does not make her continuing fear unreasonable. Coercion need not result in a hasty, emotionally-based decision. Reasonable people can decide, based on cogitation rather than precipitous capitulation, that a possible future consequence is simply unacceptable. *See Schneckloth*, 412 U.S. at 224, 93 S.Ct. 2041 ("[Voluntariness] cannot be taken literally to mean a 'knowing' choice. Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all [decisions] ... are 'voluntary' in the sense of representing a choice of alternatives.") (citation and internal quotation marks

omitted). Where, as here, that threatened consequence was inaccurate—Mukai could not legally be arrested, of course, simply for refusing to consent, so her children could not be removed for that reason either—the consent was not voluntary, however well-considered.

Under the circumstances, I conclude that the district court erred in concluding that Callas' subsequent statements were adequate to mitigate the devastating psychological effects of Shanahan's threats. Threats to the welfare of one's children are not easily overcome; a reasonable person would not automatically discount on the basis of competing representations threats by a uniformed officer who remained within earshot of the subsequent proceedings and did not disavow her statement; and a reasonable person confronted with competing representations might well give the matter some thought while in the end concluding that the risk of the threatened harm to her children's welfare is too great to credit a second, possibly less authoritative representation disavowing that risk. In short, the district court was correct in "not suggesting for a moment that she didn't have [the threat] in mind to some extent," and committed legal error, in light of that finding, in coming to the conclusion that "Ms. Mukai's consent was free and voluntary."

Replace the final paragraph of the dissenting opinion (346 F.3d at 983) with:

It is the *government* that "bears the heavy burden of demonstrating that consent was freely and voluntarily given." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1327 (9th Cir.1997) (citing *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041). The government is unable to meet this burden, and the district court

erred in concluding otherwise. I respectfully dissent.

With these amendments, Judge Tashima and Judge Clifton have voted to deny the petition for rehearing and petition for rehearing en banc. Judge Berzon has voted to grant the petition for rehearing and petition for rehearing en banc.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R.App. P. 35(f).

The petition for rehearing and petition for rehearing en banc are DENIED.

## OPINION

Herman Patayan Soriano appeals his convictions for possession of stolen mail and receipt of a stolen United States Treasury check, and also the sentence that resulted. Soriano challenges his convictions on the ground that the district court erred in denying his motion to suppress evidence found during a search of a motel room where he and his girlfriend resided. Soriano's girlfriend signed a consent form allowing the warrantless search. The issue on appeal is whether the district court clearly erred in finding that her consent was voluntary, notwithstanding a threat made to her by one of the police officers on the scene that her children could be taken away if she did not sign the form. If the conviction stands, Soriano challenges the sentence he was given on the ground that the district court erred in calculating the appropriate loss amount for sentencing purposes. We reject both challenges and affirm.

## I. BACKGROUND

On December 7, 2000, officers from the Los Angeles Police Department ("LAPD") were contacted by a bank regarding a

possibly altered check that had been presented to a teller. Based on a description of the man who was trying to cash the check, LAPD officers arrested Keenan San Yung French. French told the officers that Soriano gave him the stolen check and that Soriano was staying in Room 228 at a certain motel. He also told the police that stolen checks, credit cards, and drug paraphernalia could be found in that motel room and that the checks had been stolen from the mails at various residences in the Los Angeles area.

The LAPD officers contacted the United States Postal and Inspection Service ("USPIS") for assistance in responding to this apparent mail theft scheme. Based on the tip from French, but without a warrant, LAPD and USPIS officers went to the motel to investigate Soriano and search his room. LAPD Detective Manente was informed by the surveillance team that a woman left Room 228 and was headed to the lobby. Detective Manente approached her in the lobby and identified himself as a police officer, informing her that he was there with other officers conducting an investigation involving Soriano. The woman identified herself as Hiroe Mukai and told the detective that she, Soriano, and their two children resided in Room 228, and that she had come to the lobby to pay the rent. Manente asked for her consent to search the room, telling her that she had a right to refuse consent, but that if she did, he would obtain a search warrant. Mukai indicated that she was concerned about her two small children, who were still in the room. Manente then left Mukai with several other police officers, and three postal inspectors joined them in the lobby.

Postal Inspector Callas approached Mukai, who was sitting on a couch, and sat down in a chair next to her. He explained that he was a federal agent and that they had received information that there was stolen mail in Room 228. He placed a consent form on the table and asked for her cooperation. Mukai repeatedly told him that she did not know what to do. Inspector Callas told her that she was not a suspect in the crime, but that Soriano was, and again asked for her cooperation. He also told her that if she did not consent, the officers would seek to obtain a search warrant to search the room.

LAPD Officer Shanahan, who was standing nearby, then told Mukai that if she did not sign, she might be arrested and her children would be placed in custody with social services. Inspector Callas interrupted Shanahan and told Mukai that the only way for her children to be taken from her and placed with social services would be if she were arrested, but that they did not have any reason to suspect that Mukai was involved. Callas explained that since she was not at risk of being arrested, her children were thus not at risk. Callas then told Mukai again that she had the right to refuse consent. He also read the consent form to her because he did not know if she could read English. Mukai stated again that she did "not know what to do." She finally signed the consent form about ten minutes after Shanahan's threat. During this entire time, which lasted roughly 30 minutes, a total of six to seven officers were in the lobby, including Officer Shanahan, who remained present after articulating the threat.

The search of the motel room revealed stolen mail, numerous altered checks, bank account and credit card information pertaining to various other people, counterfeit INS documents, and a stolen United States Treasury check in the amount of $1,138. Postal inspectors also recovered solvents, such as acetone, used to chemically alter checks so that payees and amounts could be changed.

Following a two-count indictment for possession of stolen mail, 18 U.S.C. § 1708, and receipt of a stolen Treasury check, 18 U.S.C. § 510(b), Soriano moved to suppress all evidence obtained from the search, arguing that Mukai's consent was invalid because of threats and intimidation. At the suppression hearing, the district court heard testimony from Mukai, Detective Manente, and Postal Inspectors Callas and Walters. Mukai testified that she was scared and gave consent only because she wanted to prevent her children from going to a social worker. The district court concluded that Mukai had been threatened, but that her consent was voluntary. The court reasoned that although Officer Shanahan uttered a threat to the custody of her children, Inspector Callas interrupted and took time to clarify to Mukai that (a) she was not a suspect, (b) she had an unqualified right to refuse consent, and (c) her children would need to be taken into custody "only if she was arrested," which was not going to happen since she was not a suspect. The court noted that Mukai thought her decision through for 5 to 10 minutes following Inspector Callas's explanation. Thus, the court concluded that, in the "totality of the circumstances, the government has met its burden of proof [that] Mukai's consent was free and voluntary."

At trial, the government introduced physical evidence from Soriano's motel room, including personal checks, credit card applications, personal identification information, chemicals used to alter checks, and a United States Treasury check. The government established that Soriano had not been given permission to possess the undelivered mail and that the $1,138 Treasury check had been altered to change the payee. The jury returned a guilty verdict on both counts.

At sentencing, Soriano objected to the calculation of the loss amount in the Pre-Sentence Report as $15,484.62, derived by adding up the face amounts of the 20 checks found in the motel room. He argued that the loss amount should have excluded several of the checks, including a $9,661 check made out to French. Although the district court did not accept all of the recommendations of the Pre-Sentence Report, it did find that the $9,661 check payable to French was in Soriano's possession. The net result was a loss amount of $12,932.62, resulting in a base offense level of 11 and a Guideline range of 8–14 months. Soriano was sentenced to 14 months, to be followed by three years of supervised release.

## II. DISCUSSION

### A. *Motion to Suppress*

We review de novo the district court's denial of a suppression motion. *United States v. Jones*, 286 F.3d 1146, 1150 (9th Cir.2002). The district court's underlying factual finding that a person voluntarily consented to a search is reviewed for clear error. *Id.*

It is well settled that "a search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.* It is the government's burden to prove that the consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Chan–Jimenez*, 125 F.3d 1324, 1327 (9th Cir.1997). "On appeal, evidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990).

■ Our cases have identified five factors to be considered in determining the voluntariness of consent to a search. They are: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Jones,* 286 F.3d at 1152 (citing *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1989) (distilling from the case law the five factors now widely used)); *accord United States v. Reid,* 226 F.3d 1020, 1026 (9th Cir.2000) (citing the five factors); *United States v. Cormier,* 220 F.3d 1103, 1112 (9th Cir.2000) (same); *Chan–Jimenez,* 125 F.3d at 1327 (same). No one factor is determinative in the equation. *Castillo,* 866 F.2d at 1082. It is not necessary to check off all five factors, but "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors." *Chan–Jimenez,* 125 F.3d at 1327 n. 3. Nevertheless, these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry. *Bustamonte,* 412 U.S. at 224, 93 S.Ct. 2041 (rejecting "talismanic definition of 'voluntariness' mechanically applicable" to all situations); *see also United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995) ("although we have established these factors to aid in the decision making process, the full richness of every encounter must be considered ... Every encounter has its own facts and its own dynamics. So does every consent").

### 1. The threat that Mukai might lose her children

We will review these five factors in the context of this case below, but there was a more important factor in the particular circumstances of this case, so we begin with that. It was the threat to take away Mukai's children which provides the most serious basis for questioning the voluntariness of Mukai's consent to the search. If that threat had remained unabated, Mukai's consent could properly be set aside as involuntary. *See Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (all of the officers on the scene told defendant that her infant children would be taken from her if she did not cooperate; held, confession was not voluntary but coerced); *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir.1981) (confession rendered involuntary by, *inter alia,* police officer's unmitigated statements that defendant would not see her child "for a while" if she did not cooperate, and, referring specifically to her child, that she had "a lot at stake").

■ Under the totality of the circumstances, however, it was not clear error for the district court to conclude that Mukai's consent was voluntary. While a court must look at the "possibly vulnerable subjective state of the person who consents," the court must also look at the "reasonableness of that fear." *United States v. Castrillon,* 716 F.2d 1279, 1283 n. 1 (9th Cir.1983) (citing *Bustamonte,* 412 U.S. at 229, 93 S.Ct. 2041). Specifically, the court must determine whether "a person in [Mukai's] position would reasonably have feared" her children being taken into custody in light of the totality of the officers' conduct. *Castrillon,* 716 F.2d at 1283 n. 1 ("To look only to Castrillon's subjective fears, without considering the reasonableness of his alleged state of mind, would unduly hamper application of the totality of the circumstances test.").

■ It was not clear error for the district court to find that Mukai's fear for losing custody of her children, while perhaps reasonable at the time when Shanahan made the threat, was not reasonable

and did not negate the voluntariness of her consent at the time that consent was given. Several minutes elapsed between Shanahan's threat and Mukai's signing of the consent form. By that time, Inspector Callas had clarified that Mukai's children would only be taken away if Mukai was arrested, and since she was not a suspect, that was not a reasonable possibility. As the district court emphasized, the entire episode lasted some 30 minutes. Although Mukai stated several times that she was "not sure what to do," the district court found that she seemed to carefully think the situation through before ultimately signing the consent form.

■ To the extent that reasonable minds could differ on whether Mukai reasonably feared for her children such that her consent must be deemed involuntary, we cannot reverse the finding of the district court here under clear error review. *United States v. Garcia*, 135 F.3d 667, 671 (9th Cir.1998) (" 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' ") (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). So long as reasonable minds could differ, we cannot say that one of those minds is clearly erroneous.

The conclusion in the dissent that the district court's determination was clearly erroneous is simply based on a different evaluation of the evidence. The element it emphasizes as critically important is the fact that "the threat came from the only uniformed officer in the group immediately surrounding Mukai," *post* at 510. Thus, it may have appeared to Mukai "that it was Shanahan, the uniformed police officer, rather than Callas, the plain clothes postal inspector, who was calling the shots," *post* at 511. But we do not believe that the evidence was such that the district court

could not reasonably make a different finding. To begin with, anyone who has watched television shows or movies about police officers would likely infer that uniformed officers are subordinate to other officers not in uniform, because that is how they are routinely depicted. In this case, Callas was a federal agent and specifically identified himself to Mukai as such. A federal agent is ordinarily viewed as having more authority than a local police officer, certainly more than the usual uniformed patrol officer. In addition, Callas cut Shanahan off in mid-sentence and continued to do the talking thereafter. That Shanahan continued to stand nearby does not cut the other way. To the contrary, that Shanahan remained silent and in the same place, about twelve feet from where Mukai was seated, while Callas did the talking and was much closer to Mukai, suggests Shanahan's own acceptance of the situation—Callas was in charge, and Mukai could see that. After evaluating this and other evidence, the district court found that Mukai's consent was voluntary. That finding was not clearly erroneous.

### 2. The customary five factors

Nor was the district court's determination that Mukai's consent was voluntary inconsistent with the other circumstances of the encounter, notably the five factors identified in other cases and described above. As we noted, these factors are guideposts to consider in assessing the voluntariness of consent, not a checklist of requirements to be satisfied. Most support the district court's determination.

■ First, regarding whether the person giving consent was in custody, here Soriano concedes that Mukai was not. The dissent, citing *United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir.1980), argues that the threat of custody can be more coercive than actual custody. But

that was not likely the case here. Soriano has not tried to argue that Mukai's consent was involuntary because of any threat of custody. The threat of arrest here was ephemeral, certainly nothing like the threat in *Ocheltree*. In this case, after Shanahan's threat, Mukai was specifically told multiple times that she was not a suspect. It was not put to her that she would be arrested unless she gave her consent to a search of the room. By contrast, we observed in *Ocheltree* that the "only reasonable construction" that the person involved there, who was at an airport, could put on the federal agent's statement was that he would be retained in custody and not be permitted to board his plane unless he gave consent to a search of his briefcase. *Id.* at 994 (noting that if defendant was allowed to leave pending a search warrant, he would be able to destroy the evidence, thus creating the "clear implication" to the suspect that if he did not consent, he would be detained until a search warrant could be obtained). That was not the situation Mukai faced.

Second, whether the officers had guns drawn, here they did not.[1]

Third, as for *Miranda* warnings, here *Miranda* warnings were inapposite since Mukai was not in custody. *See United States v. Ritter*, 752 F.2d 435, 438 (9th Cir.1985) ("It would ... make little sense to require that *Miranda* warnings, which advise one of the right to remain silent and the right to counsel, be given by police before requesting consent.").

Fourth, regarding notice of the right not to consent, here Mukai was informed in clear and thorough detail by Inspector Callas—both before and after the Shanahan threat—that she had the right to refuse consent. And "[k]nowledge of the right to refuse consent is highly relevant in determining whether a consent is valid." *Childs*, 944 F.2d at 496; *see also United States v. Meza–Corrales*, 183 F.3d 1116, 1125 (9th Cir.1999) (same). The fact that Mukai was "confused" and "did not know what to do" does not, as Soriano insists, equate to not understanding that she had the right to refuse—she just did not know whether to exercise that right.

The fifth factor, whether Mukai was told that a search warrant could be obtained, does provide some basis to question the voluntariness of Mukai's consent. In *Cormier*, we noted that when the consenting party is not in custody, as with Mukai here, "the application of the fifth factor ... hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." 220 F.3d at 1112; *see also United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir.1994) (threatening a defendant with a search warrant intimates that "withholding of consent would ultimately be futile"). Here, multiple officers, including Callas, told Mukai that if she did not give consent to the search, their next step would be to obtain, or to seek to obtain, a search warrant. The parties dispute whether these statements were made in a threatening manner. Even assuming, however, that some of the statements were made in a threatening manner so as to imply the futility of withholding consent, when prob-

---

1. Soriano cites *Chan–Jimenez* to argue that there was an inherently coercive atmosphere in the motel lobby due to the number of officers present. But *Chan–Jimenez* is quite a different story. There, an undercover officer pulled off a stranded desert highway, with not a soul in sight, where appellant's car was broken down. Despite lack of any reasonable suspicion, the officer never took his hand off his gun, including when he asked appellant if he could search his truck. 125 F.3d at 1327. Here, the record establishes that no guns were touched, drawn, or referenced. Also, in contrast to this case, Chan was in custody. *Id.* at 1326 (holding that a Fourth Amendment seizure had occurred).

able cause to justify a warrant exists, the weight of the fifth factor is significantly diminished. *See Meza–Corrales,* 183 F.3d at 1125; *Kaplan,* 895 F.2d at 622.

 Based on the information from French, there appears to have been sufficient grounds to establish probable cause for a search warrant of the motel room. French provided the police with detailed information about Soriano's illegal activity and the evidence that could be found in the motel room. "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *United States v. Bishop,* 264 F.3d 919, 924 (9th Cir.2001) (quoting *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). It is well-settled that "the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search." *Bishop,* 264 F.3d at 924 (citing *Gates,* 462 U.S. at 238, 103 S.Ct. 2317). "When a search warrant is based solely on an informant's tip, [as in this case,] the proper analysis is whether probable cause exists from the totality of the circumstances to determine a sufficient level of reliability and basis of knowledge for the tip." *Bishop,* 264 F.3d at 924; *see also United States v. Elliott,* 322 F.3d 710, 715 (9th Cir.2003).

 We will start with reliability. When considering reliability, "[t]he courts may employ a number of methods to determine if an informant's information is reliable. It may be demonstrated . . . by admission against penal interest," for example. *Bishop,* 264 F.3d at 925. Here, after French was arrested for trying to pass an altered check, he divulged information which exposed himself to responsibility for other crimes and for potential charges of conspiracy. His statements amounted to admissions of criminal activi-

ty and could be deemed reliable on that basis. *See United States v. Estrada,* 733 F.2d 683, 686 (9th Cir.1984) (" 'Admissions of crimes, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search' "), *cert. denied,* 469 U.S. 850, 105 S.Ct. 168, 83 L.Ed.2d 103 (1984) (quoting *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)). Although it is not clear from the record, even if we assume that French had been offered favorable treatment in exchange for his statements, this would not render them per se unreliable. *See Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075 ("That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct."). Even if favorable treatment had not been offered to him, French was presumably motivated to provide information after his arrest out of hope that his cooperating would result in more lenient treatment for himself by the authorities. He could not achieve that goal if he gave false information, so the circumstances in which he provided the information further served to corroborate its reliability. *See United States v. Davis,* 617 F.2d 677, 693 (D.C.Cir.1979) (an admitted criminal participant has a strong incentive to tell the truth because "should he lie to the police," he "risks disfavor with the prosecution"), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980); *cf. United States v. Salazar,* 945 F.2d 47, 50–51 (2d Cir.1991) ("Though the informant . . . had not previously been relied on . . ., a face-to-face informant must . . . be thought more reliable than an anonymous . . . tipster [because] the former runs the greater risk that he may be held accountable if his information proves false.").[2]

**2.** Soriano challenges the reliability of

French's tip, citing *United States v. Mendoza,*

The dissent cites to a line of cases where a suspect's statements implicating a third-party were deemed "inherently unreliable" as "self-exculpatory" or "blame-shifting" statements, as opposed to self-inculpatory statements. *Post*, at 514 (citing *Williamson v. United States*, 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Lilly v. Virginia*, 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); and *United States v. Hall*, 113 F.3d 157 (9th Cir.1997)). But this case is not like those, where the suspects did not incriminate themselves as to anything more than the officers already had. Having been caught for a criminal offense, the suspects were simply trying to shift the primary responsibility to others. Here, French was picked up for trying to pass *one* altered check, but told the police about much, much more. In telling about Soriano, he admitted his own involvement to having opened bank accounts and deposited altered checks on multiple occasions, well beyond the specific violation for which he had been arrested. His statement also potentially put himself into a conspiracy with Soriano that extended to a scheme of widespread theft and alteration of checks, including theft from the U.S. mail. Although he may have painted Soriano as the mastermind, it is undeniable that French implicated himself in criminal activity well in excess of what the police had him for at that time: the one episode of passing an altered check, plus potentially whatever evidence they might have obtained from searching *his* motel room (unrelated to activity with Soriano).[3] This case is therefore unlike a case like *Hall*, where a suspect was arrested on various drug charges and pointed the police to his dealer, without inculpating himself in any additional criminal activity. *See Hall*, 113 F.3d at 159. Although French, like Hall, was caught "red-handed," *id.*, French gave up a lot more than the police had against him, thereby rendering his statements self-inculpatory admissions of criminal activity.

The dissent also focuses on the fact that French was arrested for forgery, a crime of dishonesty, and argues that such a record of dishonesty requires that there be additional corroboration before probable cause can be established. *See Elliott*, 322 F.3d at 714–16; *see also United States v. Reeves*, 210 F.3d 1041, 1045 (9th Cir.2000). In those cases, the informants were persons with prior records involving crimes of dishonesty. The informant in *Elliott* was described as having a criminal history including "fourteen prior convictions ... and an arrest for forgery, a crime of dishonesty...." 322 F.3d at 714. The informant in

441 F.2d 1107, 1108–09 (9th Cir.1971), for the proposition that an accomplice's tip (where the accomplice is acting as a first-time informant) must be corroborated. But *Mendoza* did not hold that corroboration was always necessary in first-time informant situations. Rather, we held that corroboration, coupled with the other facts in that particular case, was sufficient to establish probable cause in the factual circumstances of that particular case. *Id.* at 1108. *Compare id., with United States v. Mendonsa*, 989 F.2d 366, 368–69 (9th Cir.1993) (corroboration is necessary if the information is from an anonymous tipster due to the unique reliability problems associated with anonymous tips).

3. French also indicated that he received stolen checks and credit cards from a different person, "Jo Jo," who resided at a different motel in North Hills, in Room 112. French related that he was a registered guest in that room and gave the authorities a key and permission to search that room. Authorities searched that room subsequent to the search at issue here, and found various stolen checks and counterfeit identification documents, leading to arrests and indictments independent of this case, which we do not further discuss.

*Reeves* had previously been convicted of falsely reporting a crime. 210 F.3d at 1045. In contrast, there is no indication that French had a prior criminal record, or any history of unreliability in reporting criminal acts suggesting "the possibility that he would lie to the police to frame an innocent man." *Id.* Perhaps more to the point, information from dishonest informants may still provide a basis for probable cause. Such turned out to be the case in *Elliott* and *Reeves,* in both of which convictions were ultimately affirmed. The reliability under these circumstances of the admission by French of his own criminal activity, even though of a dishonest nature, overcomes any doubt raised by the fact that he was involved in a dishonest crime. The Supreme Court did not say that admissions of crimes, *except dishonest ones,* carry their own indicia of reliability. *Harris,* 403 U.S. at 583, 91 S.Ct. 2075.

Because of the nature of what French told the police and the circumstances in which he made his statement, we conclude that the reliability component to the probable cause inquiry was satisfied. That brings us to consider the basis of the informant's knowledge.

■■■■ "When considering basis of knowledge, courts look for how the informant came by his or her knowledge." *Bishop,* 264 F.3d at 925 (internal quotation marks and citation omitted). In this case, French tipped the authorities quite specifically based on first-hand observations, providing them with Soriano's name, exact motel and room number, and what items would be found in the room, *viz.,* stolen checks, credit cards and drug paraphernalia. These detailed, first-hand observations satisfy the basis of knowledge component. *See id.* (basis of knowledge established by informant's information, which "was not based on hearsay, but came from first-hand knowledge"); *Estra-*

*da,* 733 F.2d at 686 (basis of knowledge established when informant "admitted to extensive involvement in the criminal scheme with appellants and based his statements on personal knowledge and observation").

■■■ Thus, the information received from French "suffices for the practical, common-sense judgment called for in making a probable-cause determination." *Gates,* 462 U.S. at 244, 103 S.Ct. 2317. Because it is reasonable to conclude that the officers could have obtained a search warrant for the motel room, their statements to that effect to Mukai did not serve to invalidate her consent to the search here.

Since we conclude that the finding of the district court that Mukai voluntarily consented to the search was not clearly erroneous, the motion to suppress was properly denied and the convictions must be affirmed.

### B. *Sentencing Enhancement*

■■■■ A district court's application of the sentencing guidelines is reviewed for an abuse of discretion. *United States v. Munoz,* 233 F.3d 1117, 1125 (9th Cir.2000). Factual findings, such as whether Soriano possessed the $9,661 check, are reviewed for clear error. *Id.* Since the factual finding here does not have a disproportionate effect on the sentence—including the $9,661 check made only a two-level difference—the facts must be proven only by a preponderance of the evidence. *United States v. Hopper,* 177 F.3d 824, 832–33 (9th Cir.1999); *see also Munoz,* 233 F.3d at 1126–27.

■■■ Soriano argues that the district court clearly erred by attributing the $9,661 check to him, resulting in an upward adjustment of five levels instead of three levels. We disagree. Soriano first

notes that the check was not presented as evidence at trial, but cites no authority for why it had to have been. Since it was only relevant to the loss amount for sentencing purposes, not to guilt, it was not clear error to take it into account only at the sentencing phase. *See Munoz*, 233 F.3d at 1127. Soriano also notes that the check did not have his fingerprints, but does not cite any authority for the proposition that a person's fingerprints must be found on an object for it to be deemed within his possession. That is not the law. The check was found in Soriano's motel room, and it was not clear error to infer that Soriano was responsible for it. He also attempts to disclaim responsibility for the check by arguing that the check was made payable to French. But if Soriano was selling or altering checks, they would naturally be made payable to his customers (or their fictitious names). Indeed, two other checks made payable to French were found in Soriano's wallet.

Soriano also suggests that the check could have been in French's belongings, insinuating that French may have visited the room near the time of arrest. But that does not make the finding that Soriano possessed the check clearly erroneous. The government established that there were various alteration chemicals found in Soriano's room, that the check was stolen from the mails, that it had been altered to change the payee and the amount, and that two other checks made out to French were found in Soriano's wallet. These circumstances were enough to conclude, by a preponderance of evidence, that Soriano possessed the check, even if French had been a guest in the room. It was, therefore, not clear error for the district court to attribute the check to Soriano.

## III. CONCLUSION

For the foregoing reasons, we affirm the denial of Soriano's motion to suppress, and thus affirm his conviction.[4] We also par-

---

4. After the initial publication of the opinions in this case and during our court's consideration of Soriano's petition for rehearing en banc, Judge Berzon amended her dissenting opinion, notably to shift the basis of her dissent from a conclusion that the district court had committed "clear error" in its factual findings to an assertion that it had committed certain "legal errors." At this stage we are not inclined to redraft our majority opinion to respond in a more comprehensive fashion, but instead will simply state that we disagree with her analysis.

We feel compelled to note, however, that we believe that the dissenting opinion, as amended, contains significant misstatements, second paragraph, newly added to the dissent as part of the amendment. In broad terms, we do not believe we made the assumption or drew the conclusion attributed to us in that paragraph. More specifically, the dissent incorrectly asserts that there was "a finding that impermissibly coercive *statements* [plural] occurred." *Infra* at ―― (emphasis added). There was no such finding, and there is no basis for asserting that there was any more than a *single* statement identified by the dis-

trict court as a source of concern, that being the statement by Officer Shanahan, which was immediately followed by corrective statements by Postal Inspector Callas. Nor was there a finding, as the dissent asserts, that Shanahan's statement *"did* impact the decision to consent." *Id.* (emphasis in original). The district court found that Mukai did have her concern for her children "in mind to some extent," but that is not quite the same thing, and not a finding that Mukai's consent resulted from Shanahan's threat. The district court considered the entire context, including the statements made by the other officers correcting Shanahan's statement and the fact that Mukai took time to think before giving consent.

Finally, there was no conclusion that "a consent *can become* voluntary *simply* because there was time to deliberate." *Id.* (emphasis added). Mukai's consent did not change from "involuntary" to "voluntary." The district court found, based explicitly on "the totality of circumstances," that Mukai's consent was "free and voluntary." That determination did not rest "simply" on the fact that there was time available for Mukai to think. It was

ticularly in its affirm his sentence based on the district court's computation of the loss amount.

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

Faced with conflicting representations by two law enforcement officers, Hiroe Mukai did the only thing that a reasonable parent could have done under the circumstances: She consented to a search for fear that the representation of one of the two officers that her young children would be taken from her if she did not consent would prove correct. The trial court recognized that when signing the consent form Mukai *did* "have [ ] in mind to some extent" her fear that her children would be taken from her if she refused to accede to the officers' demand. Yet, the trial court concluded that Mukai's consent was voluntary.

In affirming the district court's decision, the majority ratifies at least two unacknowledged legal errors: first, the assumption that where there is a finding that impermissibly coercive statements occurred and *did* impact the decision to consent, as here, the decision can nonetheless be voluntary even if the reliance on the coercive statements was reasonable; and second, the conclusion that a consent can become voluntary simply because there was time to deliberate concerning whether to rely on impermissibly coercive statements.

At the outset, I note that although the ultimate question whether Mukai's consent was voluntary is a factual one, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the trial court's errors, described above,

based on the entire collection of facts, one of which was that Mukai actually took the time to deliberate and was not stampeded into

involved the application of the legal standards for voluntariness of consent. *See Culombe v. Connecticut,* 367 U.S. 568, 603, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (explaining that the voluntariness inquiry requires "the application ... of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances"); *see also Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041 ("In determining whether a defendant's will was overborne in a particular case," a court must "evaluate[ ] the legal significance of how the accused reacted.") (citing *Culombe,* 367 U.S. at 603, 81 S.Ct. 1860).

Accordingly, I respectfully dissent.

I.

A partial recounting of the disturbing facts of this case is necessary for a full understanding of my reasons for dissenting:

When Mukai asked the officers who first approached her in the motel lobby why it was that they wanted to search her family's motel room, she was told, "We know what's going on. There is stolen mail, some drug activity." She was asked a series of questions about the occupants of the hotel room, her relationship to Herman Soriano, whether or not she was using drugs, the location of her place of work, and her occupation. Detective Manente told her that if she refused consent, the officers would obtain a search warrant. Throughout the 30 minute encounter, Mukai was surrounded by six to seven LAPD officers and federal agents and was continually pressed for her consent.

consenting immediately following Shanahan's improper statement.

Mukai's primary response from the outset was to express concern about her two children, who remained in the motel room. As Manente testified, "the only concerns . . . she had were for her children, what was going to happen with her children." Mukai repeated these concerns when Officer Callas arrived, as he subsequently testified.

It was against this backdrop that Shanahan's threat took place. Mukai testified at the suppression hearing:

> I was start crying and shaking and female officer beside was [saying] calm down, calm down, so took me for long time about 10, 15 minutes and then suddenly, I don't know her name, but female officer wearing uniform [Officer Shanahan] go show up in front of me. She was so frustrated because took so long. . . . She said you only have two choice. If you're going to sign this paper and help us or we going to get search warrant and kick the door, they might kick the door and you might, I might [be] arrested and my two children will be in social worker.

The district court fully credited this testimony, finding that "the LAPD officer did tell her that if she refused to sign that she might be arrested and that her children would go to social workers." Critically— although both the trial court and the majority ignore this fact—the threat came from the only uniformed officer in the group immediately surrounding Mukai. Officer Callas was *not* in uniform.

Callas testified that he attempted to explain the situation accurately to Mukai, who was visibly distraught, stating:

> Now, if you do get arrested your children will have to go in some type of protective services, social services or someplace. At that time we have no information you're involved and no reason [to] arrest you at this time. I don't

want you to think about your kids . . . when thinking about the consent form.

Callas reiterated that if Mukai did not consent, the officers would obtain a search warrant. During this time, Shanahan remained precisely where she had been when she spoke to Mukai—about twelve feet from where Mukai was seated. At no time did Shanahan make any effort to disavow her statement.

Faced with somewhat conflicting representations by two law enforcement officers concerning what would happen if she refused to give consent to the search, Mukai signed the form after understandable hesitation. As she explained: "Why I signed that form, I feel like I have to. I'm scared. Even small possibility that they might get my children to the social worker, I don't want it to happen."

Unfortunately for Mukai, Soriano, and our system of justice, Officer Shanahan's baseless threat worked.

## II.

As the majority commendably recognizes, the central focus in determining the voluntariness of Mukai's consent must be on Officer Shanahan's threat. While the majority recognizes that the threat standing alone could invalidate Mukai's consent, it concludes that the district court did not clearly err in relying on the lapse of time and clarification by Inspector Callas in concluding that Mukai's consent was voluntary. This conclusion (1) disregards the degree of coercion created by a threat to take away a parent's children; (2) attributes to Mukai some basis for believing Inspector Callas over Officer Shanahan, when a reasonable lay person would have no basis for such a choice; (3) emphasizes that Mukai thought hard about whether to give consent, yet her deliberation—as Mukai testified and as the judge expressly

recognized—reasonably took into account the risk that the threat would be carried out, precluding a voluntary choice in the sense required by the Fourth Amendment.

*First,* Shanahan's baseless threat was made in a deliberate attempt to "prey upon the maternal instinct," *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir. 1981), after Mukai repeatedly expressed concern regarding her children. For a parent, there is no threat greater than the threat to take away one's children. "The relationship between parent and child embodies a primordial and fundamental value in our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert [ ] 'improper influence.' " *Id.*

Such psychological coercion undermines the voluntariness of consent. *See id.; see also Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (confession was not voluntary where a mother was encircled by three police officers and told that her children would lose their state financial aid and be taken away from her if she did not cooperate); *United States v. Ivy,* 165 F.3d 397, 403–04 (6th Cir.1998) (officer's threat to arrest Ivy's wife and take away her child were "attempt[s] to overcome's Ivy's resolution *not* to consent" to a search and therefore "constituted an objectively improper police action ... significantly intensifying the coercive tenor of the request for consent"). A reasonable person would have given weight, as did Mukai, to "[e]ven [a] *small possibility* that they might get my children to the social worker."

The district court did not disbelieve Mukai's representation that she considered that risk in making her decision, but indicated that a reasonable person would not have done so, as she would have been reassured by Callas' representations. A threat to the welfare of one's children, however, is not easily discounted on the basis of a competing reassurance. Given the nature of the threat, a reasonable person would share Mukai's disinclination to disregard "even a small possibility" that it would be carried out.

*Second,* the district court erred in concluding that a reasonable person would have determinatively credited Inspector Callas' reassurances over Officer Shanahan's threats. True, Callas indicated to Mukai that her arrest was unrelated to her decision regarding consent. Shanahan, however, the only officer in uniform, never recanted her threat and remained standing nearby, presumably within earshot, for the remainder of the conversation.

Callas' attempts to reassure Mukai simply presented Mukai with a conflicting account of her prospects, without affording her any basis for deciding which of the two accounts was accurate. The result, to a reasonable person, was at least a realistic risk that it was Shanahan, the uniformed police officer, rather than Callas, the plain clothes postal inspector, who was calling the shots and was in a position to implement her threat.

Further, Callas continued to advise Mukai that if she were arrested, her children would indeed be taken away. Even if this contingent statement were true, a reasonable person would nonetheless have felt coerced. *Cf. Tingle,* 658 F.2d at 1335–36 (warnings of long prison term and separation from child were coercive even though Tingle was a suspect and information was therefore arguably accurate). Moreover, Shanahan's and Callas' respective statements that Mukai's arrest would mean her children would be placed in state custody were not even accurate. *See Ivy,* 165 F.3d at 403 (noting that even if both parents were arrested, "there were supervision al-

ternatives to state custody, such as having the child stay with a friend or relative"). Rather than mitigate the effect of Shanahan's threat, Callas' continued reference to the circumstances under which her children would be placed in social services echoed the threat and thus reinforced a reasonable fear for her children's well-being and for her own liberty. Additionally, Callas' repeated statements that Mukai should not take her children's fate into account in making her decision could well have been understood as a directive to make a decision without taking her children's interests into account, rather than as an assurance that they were not at risk should she fail to consent.

*Third,* as additional evidence of mitigation, the district court considered that Mukai took five to ten minutes after Shanahan's threat to make up her mind, noting: "That was a long time." Yet given the weight of the decision facing Mukai and the obvious stress of the situation, five to ten minutes was not long at all. On the contrary, a reasonable person might well have taken that long, weighing the representation of one officer that her children could suffer harm as a result of her decision against the hedged implication by another that her failure to consent could not itself affect her fate or that of her children. Indeed, a reasonable person might well have been confused as to the authority of the postal inspectors in relation to the police officers, as contact with postal inspectors is presumably less common for the average citizen. Given the gravity of the risk involved and the conflicting representations, a reasonable parent would take time to decide whether the prudent course was to believe the worst and act to prevent it.

In determining otherwise, the district court and the majority posit a model of voluntary decisionmaking that cannot be reconciled with the values underlying the Fourth Amendment. That Mukai "seemed to carefully think the situation through before ultimately signing the consent form," *ante* at 503, or "was told that it was her decision and . . . was thinking it over" for either five or ten minutes, as the district court found, has nothing to do with the voluntariness issue. Mukai forcefully testified that the decision she finally made was the result of her fear that Shanahan's prediction concerning her children's fate should she fail to consent could prove true. That she thought for a while before coming to that conclusion does not make her continuing fear unreasonable. Coercion need not result in a hasty, emotionally-based decision. Reasonable people can decide, based on cogitation rather than precipitous capitulation, that a possible future consequence is simply unacceptable. *See Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041 ("[Voluntariness] cannot be taken literally to mean a 'knowing' choice. Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all [decisions] . . . are 'voluntary' in the sense of representing a choice of alternatives.") (citation and internal quotation marks omitted). Where, as here, that threatened consequence was inaccurate—Mukai could not legally be arrested, of course, simply for refusing to consent, so her children could not be removed for that reason either—the consent was not voluntary, however well-considered.

Under the circumstances, I conclude that the district court erred in concluding that Callas' subsequent statements were adequate to mitigate the devastating psychological effects of Shanahan's threats. Threats to the welfare of one's children are not easily overcome; a reasonable person would not automatically discount on the basis of competing representations threats by a uniformed officer who remained within earshot of the subsequent

proceedings and did not disavow her statement; and a reasonable person confronted with competing representations might well give the matter some thought while in the end concluding that the risk of the threatened harm to her children's welfare is too great to credit a second, possibly less authoritative representation disavowing that risk. In short, the district court was correct in "not suggesting for a moment that she didn't have [the threat] in mind to some extent," and committed legal error, in light of that finding, in coming to the conclusion that "Ms. Mukai's consent was free and voluntary."

### III.

I would end my analysis with the foregoing and reverse the district court's finding that the search was consensual. The majority, however, goes on to the five-factor analysis applicable to the consent issue in more usual circumstances. In conducting that analysis, the majority errs in two respects:

(1) Consideration of whether the person was in custody weighs *against* the voluntariness of Mukai's consent. While not *in* custody, Mukai was explicitly threatened with arrest. The threat of custody if consent is withheld is *more* coercive than the actual fact of custody, as the implication that the individual's consent will favorably affect her fate is all the more direct. *Compare United States v. Ocheltree,* 622 F.2d 992, 994 (9th Cir.1980) (where there was a "threat that unreasonable detention, amounting to arrest" would result if consent was refused, consent was not voluntary) *with Kaplan,* 895 F.2d 618, 622 n. 3 (9th Cir.1990) (because defendant had already been arrested, threat of detention while search warrant was obtained did not render consent involuntary). Although Callas informed Mukai that she was not a suspect, Mukai had also been interrogated

about potential criminal activity (drug·use), and Shanahan said she could be arrested for refusing to consent. Given the conflicting information provided by Shanahan and Callas, it was reasonable for Mukai to believe that her arrest was possible if she did not agree to the search.

(2) Consideration of the fifth factor—whether the officers threatened to obtain a search warrant—provides further support for the conclusion that a reasonable person would have construed the combination of statements made by Shanahan, Manente, and Callas to connote that refusing consent was futile. *Cf. United States v. Kim,* 25 F.3d 1426, 1432 (9th Cir.1994). The majority concludes that this factor deserves little weight because the government had probable cause, so the representation was truthful. *See Kaplan,* 895 F.2d at 622 (where probable cause exists, consent not likely to be held invalid based on threats to obtain a search warrant). In my view, however, the informant's self-serving statements were inherently suspect and thus insufficiently reliable to establish probable cause.

French's arrest was for forgery. "When an informant's criminal history includes crimes of dishonesty, additional evidence must be included in the affidavit 'to bolster the informant's credibility or the reliability of the tip.'" *United States v. Elliott,* 322 F.3d 710, 714, 716 (9th Cir.2003) (quoting *United States v. Reeves,* 210 F.3d 1041, 1045 (9th Cir.2000)). As *Elliott* noted, "[o]therwise, 'an informant's criminal past involving dishonesty is fatal to the reliability of the informant's information, and his/her testimony cannot support probable cause.'" *Id.* (quoting *Reeves,* 210 F.3d at 1045).

French's arrest for forgery was sufficient to raise doubts about his reliability, as "[a]ny crime involving dishonesty *necessarily* has an adverse impact on an infor-

mant's credibility." *Id.* at 716 (quoting *Reeves,* 210 F.3d at 1045) (emphasis added). In *Elliott,* as in this case, the police were aware that the informant had previously been arrested (though not convicted) for forgery on one occasion. *See id.* at 714. The informant in *Elliott* had no other arrests or convictions involving crimes of dishonesty. *See id.* As in *Elliott,* French's arrest was sufficient to put his credibility at issue—regardless of his lack of any other criminal history. The majority is correct that "information from dishonest informants may still provide a basis for probable cause." *See ante* at 507. But that is only the case where there are additional circumstances not present here, such as an informant's history of giving reliable tips. *See, e.g., Elliott,* 322 F.3d at 716 (concluding that the informant's "record of providing six reliable drug-related tips in the preceding three months was sufficient to overcome any doubts raised by his motives and prior criminal and personal behavior"); *Reeves,* 210 F.3d at 1044–45 (concluding that the informant's provision of three prior reliable tips were enough to outweigh concerns raised by a criminal history of dishonesty). Here, there is no such history of reliable tips. Instead, the majority bases its conclusion that French's information was reliable on a characterization of his statements as statements against penal interest. *See ante* at 505. That characterization is wrong.

As the Supreme Court cautioned in *Williamson v. United States,* 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the principles underlying the idea that statements against interest are uniquely trustworthy do not apply to accomplice statements that inculpate another person. "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the

plausibility of the self-exculpatory statements." *Id.* at 600, 114 S.Ct. 2431; *see also United States v. Hall,* 113 F.3d 157, 159–60 (9th Cir.1997) (applying *Williamson* to conclude that co-participant's statements inculpating the defendant were insufficient to establish probable cause where co-participant had criminal history of dishonesty). The Supreme Court has repeatedly recognized that the blame-shifting statements of an accomplice are "inherently unreliable." *Lilly v. Virginia,* 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *see also id.* ("[W]e have over the years spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.") (internal quotation marks and citation omitted). In sum, "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect." *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

A close examination of Keenan San Yung French's statements illustrates why they were *not,* counter to the majority's conclusion, statements against his penal interest. Shanahan's police report described the information about Soriano that French provided upon his arrest:

> While handcuffing the susp[ect], susp[ect] began telling me about how he wasn't the only one.... Susp[ect] stated that some short time ago, he met a guy named Herman through a mutual friend. Herman became aware of susp[ect]'s financial dire straits and offered to assist him with his outstanding bills if he would help him. Herman explained to susp[ect] that all he had to do was open bank accounts and deposit checks for him. Susp[ect] complied and deposited several for him until Herman cleaned out one of the accounts and left the

susp[ect] with no money.... Susp[ect] continued that Herman is involved with check stealing and forging very deep and has numerous stolen checks in his hotel room at the Travel Inn located at 8525 Sepulveda Blvd. He also stated that Herman has approx[imately] 6 stolen cellular phones in his room and possibly narcotics.

While the majority is correct that the portions of French's statement indicating that he opened bank accounts and deposited checks may have exposed him to additional criminal liability and thus constitute statements against his penal interest, the same is not true of the parts of French's statements with regard to Soriano's participation. At issue here is *not* the reliability of the portion of French's statements about his own criminal activity, but the portion of his statements implicating Soriano. As *Williamson* instructed,

> The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*Williamson*, 512 U.S. at 599–600, 114 S.Ct. 2431.

Justice O'Connor's observation in her plurality opinion in *Williamson* is particularly apt here: Statements inculpating other individuals "did little to subject [the declarant] to criminal liability.... Small fish in a big conspiracy often get shorter sentences than people who are running the whole show, especially if the small fish are willing to help the authorities catch the big ones." *Williamson*, 512 U.S. at 604, 114 S.Ct. 2431 (plurality) (with Scalia, J.) (internal citation omitted); *see also id.* at 607–09, 114 S.Ct. 2431 (Ginsburg, J., concurring in part and concurring in the judgment) (declarant's statements were not statements against interest because they painted defendant as "the 'big fish' "). French's statements implicating Soriano focused primarily on shifting blame to Soriano, whom he portrayed as the mastermind behind the check-forging scheme. As a result, the statements about Soriano cannot properly be considered declarations against penal interest and do not carry with them the indicia of reliability normally attendant to self-inculpatory statements.[1]

---

1. The majority attempts to distinguish *Williamson*, *Lilly*, and *Lee*, by mischaracterizing them as cases in which "the suspects did not incriminate themselves as to anything more than the officers already had." *Ante at 506.*

In *Williamson*, in the course of his confession the informant admitted to his knowledge that there was cocaine in the briefcase he was transporting, "essentially forfeit[ing] his only possible defense to a charge of cocaine possession, lack of knowledge." *See* 512 U.S. at 603, 114 S.Ct. 2431 (O'Connor, J.). The informant also potentially implicated himself in a conspiracy with Williamson to possess or distribute cocaine. *See Williamson*, 512 U.S. at 597, 114 S.Ct. 2431.

In *Lilly*, the informant confessed to participating in burglary and robbery, and admitted

that he was present during a homicide. *See* 527 U.S. at 121, 119 S.Ct. 1887.

In *Lee*, the co-defendant had confessed that he and Lee premeditated the murders in question, whereas the only other evidence available to police was that the murders were committed after provocation on the spur of the moment. *See Lee*, 476 U.S. 530, 534–35, 106 S.Ct. 2056, 90 L.Ed.2d 514.

The majority correctly notes that the informant in *Hall* did not provide much inculpatory information beyond what the police already knew. *See ante at* 505–06. But *Williamson*, *Lilly*, and *Lee* demonstrate that, contrary to the majority's contention, mere proximity to non-cumulative self-inculpatory statements does not change the fact that French's self-exculpatory statements concerning Soriano do not qualify as statements against interest.

This conclusion is even more apparent when we consider that French provided these self-serving statements *after* his arrest, knowing that the police had information supporting his criminal liability. By the time French implicated Soriano, the police had found a check in French's pocket which was made out in French's name, and, according to the police report, was "obviously altered." The police had also retrieved from French's pocket a key to his hotel room, where, as French was aware, there was extensive evidence of French's check-forging and mail-theft scheme. French had also heard a Washington Mutual Bank representative, who had arrived at the scene of his arrest, relate to the police the circumstances of French's failed attempt to cash a forged check. "Once a person believes that the police have sufficient evidence to convict him, his statement that another person is more important to his criminal enterprise than he gains little credibility from its inculpatory aspect." *Hall*, 113 F.3d at 159.

I agree with the majority that "admissions of crime" may be sufficiently reliable to support probable cause. *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). I am also well aware that probable cause determinations "do[ ] not demand the certainty we associate with formal trials." *Illinois v. Gates*, 462 U.S. 213, 246, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Nonetheless, *Williamson* reflects the general need to carefully distinguish statements which are "inherently unreliable," *Lilly*, 527 U.S. at 131, 119 S.Ct. 1887, from those which are truly "against interest." French's self-serving statements concerning Soriano were not

statements against his penal interest and cannot be deemed reliable on that basis.

In concluding that French's information was sufficiently reliable to support probable cause, the majority also considers that the officers had corroborated the information regarding Soriano's motel and room number. But the corroboration of one innocent and easily discoverable fact, the location of Soriano's residence, does not establish reliability. *See United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993) (distinguishing a "mere confirmation of innocent static details" from "prediction of significant future activity to carry out particular criminal activity"); *compare Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (an accurate description of a subject's readily observable location does not show knowledge of concealed criminal activity), *with Gates*, 462 U.S. at 245, 103 S.Ct. 2317 (information reliable where it contains "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted"). Particularly where, as here, the informant has a criminal history involving dishonesty, the corroboration of a few innocent details is inadequate to demonstrate that the information is worthy of belief. *See Hall*, 113 F.3d at 159 ("The innocent details do even less to corroborate a tip from a man known to have made a false report to the police" than they do to corroborate an anonymous tip.); *id.* (corroboration of the color of suspect's vehicle and the location of his trailer was inadequate to establish reliability of co-participant's information).[2]

Under the totality of the circumstances, French's inherently unreliable statements, corroborated only by one easily discover-

---

**2.** The majority distinguishes cases requiring corroboration of *anonymous* tips. *See ante* at 505–06 fn. 2. However, as *Hall* illustrates, the statements of an informant with a criminal

history of dishonesty may present reliability problems greater than those presented by an anonymous tipster. *See* 113 F.3d at 159.

able and innocuous fact, were insufficient to establish probable cause. *Cf. Hall*, 113 F.3d at 159 ("How could the trooper tell whether [the informant] was leading them to his supplier, a competitor, or to an innocent man?"). The officers' repeated statements that they would obtain a search warrant if Mukai refused therefore provide strong support for the conclusion that Mukai's consent was involuntary.

\* \* \* \*

For half an hour, Mukai was ringed by six to seven law enforcement officers pressuring her to give consent to a search of her hotel room. While Mukai was told by a postal inspector that her giving or failure to give consent would not affect her children, she was also told by a uniformed member of the LAPD that her refusal to consent could lead to arrest and separation from her children. The uniformed officer stood nearby for the next five to ten minutes during which Mukai made her decision and never recanted the threat. During this time, Mukai was reminded that *if* she was arrested, her children would indeed be taken away. She was told several times that if she refused, the officers would obtain a search warrant, even though probable cause was lacking. A reasonable person—a reasonable parent—faced with this situation would not have felt at liberty to refuse consent.

It is the *government* that "bears the heavy burden of demonstrating that consent was freely and voluntarily given." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1327 (9th Cir.1997) (citing *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041). The government is unable to meet this burden, and the district court erred in concluding otherwise. I respectfully dissent.