**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ediberto A. ALVAREZ–FARFAN,**
**Defendant–Appellant.**

**No. 02–10324.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 2003.

Filed Aug. 7, 2003.

Fred Hill Atcheson, Reno, NV, for the defendant-appellant.

Craig S. Denney, Assistant United States Attorney, Reno, NV, for the plaintiff-appellee.

Before: D.W. NELSON, W. FLETCHER, Circuit Judges, and ALSUP,* District Judge.

* The Honorable William Alsup, United States District Judge for the Northern District of California, sitting by designation.

D.W. NELSON, Senior Circuit Judge.

Ediberto Alvarez–Farfan ("Alvarez") appeals his jury conviction for distribution of methamphetamine in violation of 21 U.S.C. § 841.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

This case involves three central actors: Rene Blanco, a suspected methamphetamine distributor in Winnemucca, Nevada; Pedro Rivera, a confidential informant working for the Government; and Alvarez, a Mexican immigrant living in Winnemucca.

No one agrees on how these three came to know one another. Alvarez claims that Blanco's father-in-law hired him to perform odd jobs on his property. He insists that he met Blanco, whom he knew only casually, through that work. The Government maintains that Alvarez knew Blanco because the two ran an illegal drug operation together.

Whatever their relationship, the Drug Enforcement Administration ("DEA") began investigating Blanco's suspected illicit activities in the fall of 2001 and connected Alvarez to Blanco in the process.

On September 21, 2001, the DEA arranged for Rivera to meet Blanco at Blanco's home to negotiate a deal in which Rivera would purchase drugs from Blanco. Rivera testified that Blanco offered to sell him half a pound of methamphetamine for $2,500 or a pound at a discounted price of $4,500. Rivera also testified that Alvarez, a man he knew only as "El Negro," witnessed the negotiations.

Rivera and Blanco met at another of Blanco's Winnemucca residences a week later. This time, Rivera wore a concealed recording device. Rivera testified that he told Blanco that he wanted to buy half or three-quarters of a pound of methamphetamine and that Blanco offered to sell him three-quarters of a pound for $3,750. Rivera also claimed that he saw Alvarez at Blanco's home that day.

Blanco and Rivera planned to meet at a local Holiday Inn to complete the sale, but Blanco called the designated hotel room at the last minute and changed the location to the Economy Inn. The DEA furnished Rivera with $3,750 cash and fitted him with a wireless transmitter before he set out for the Economy Inn. DEA agents observed Rivera arrive at the Economy Inn and walk toward the specified motel room. They also saw him return to his car a few minutes later to retrieve something and then approach the motel room a second time.

Because the trial court excluded the audio tape recording of the alleged drug transaction inside the Economy Inn, Rivera's account provided the sole testimony supporting the Government's claim that Alvarez sold methamphetamine to Rivera. Rivera testified that he met Alvarez inside the Economy Inn motel room. He said that Alvarez recovered the drugs from underneath the bed and presented them to him. Rivera then went to his car to gather the $3,750 and returned to the room. Rivera testified that he and Alvarez then exchanged the drugs and the money, and Alvarez counted the cash. According to Rivera, Blanco then called and spoke to Alvarez. Rivera testified that he asked Alvarez to tell Blanco that next time he wanted to buy two pounds of methamphetamine. Alvarez agreed to relay the message.

On October 16, 2001, the DEA sent Rivera to Blanco's home to purchase one pound of methamphetamine. A concealed recording device documented their conver-

---

1. We disposed of the other issues Alvarez raised on appeal in an unpublished memorandum disposition filed concurrently with this opinion.

sation: Alvarez accused Rivera of working "with the narcs" and said "[o]n that day I just … did the favor." Alvarez also ordered Rivera to keep his distance from Blanco's home.

DEA agents arrested Alvarez and Blanco later that day.

Alvarez currently is serving a 151–month sentence, which will be followed by a five-year period of supervised release. His immigration status may subject him to deportation upon his release from prison.

At trial, Alvarez sought to demonstrate that he was not present during the drug transaction. He offered a confidential-informant debriefing statement, handwritten by Rivera, along with a motel receipt. Alvarez wanted the jury to conduct a handwriting comparison of both documents and hoped to prove that Rivera, not Alvarez, rented the motel room at the Economy Inn.

## STANDARD OF REVIEW

■ We review the district court's decision to exclude the debriefing statement and the motel receipt for an abuse of discretion, *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir.2000).

## DISCUSSION

■ The law on handwriting comparison is plain. "In the absence of extreme or unusual circumstances … we see no reason why handwriting comparisons cannot be made by jurors, and conclusions drawn from them, either in the presence or absence of expert opinion." *United States v. Woodson*, 526 F.2d 550, 551 (9th Cir.1975) (per curiam); *see also United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir.1986) (holding that " '[e]xtreme or unusual circumstances' involve situations where the authenticity of the handwriting is the pri-

mary issue in the case, as where forgery is alleged"). In *Woodson*, we relied on 28 U.S.C. § 1731, which provides that "[t]he admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person." When the district court ruled that Alvarez could not admit the debriefing statement and receipt into evidence for handwriting comparison, it stated:

> The reason I rejected the offer of the document is that there isn't any competent evidence of similarity of handwriting in the two documents.
>
> My own examination of the document showed that the unfair prejudice to the government might arise by virtue of the fact that to me the handwriting is dissimilar.
>
> Without a questioned document examiner to vouch for the similarity of the handwriting, I do not believe I'm going to call upon the jury to speculate that one person wrote both documents.

The district court abused its discretion in preventing the jury from comparing the documents. The law does not require "a questioned document examiner to vouch for the similarity of handwriting," but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents. In fact, "*Woodson* makes clear that the jury is *obliged* to make such comparisons and draw conclusions from them." *Jenkins*, 785 F.2d at 1395 (emphasis added). Because Rivera's debriefing statement unquestionably qualifies as Rivera's "admitted or proved handwriting," the district court erred in preventing the jury from comparing the documents to determine whether Rivera also signed the motel receipt.[2] 28 U.S.C. § 1731.

2. The Government raised for the first time at oral argument an objection to the handwritten documents pursuant to Federal Rule of Evidence 403. Because the district court did not have an opportunity to consider the ad-

■ Error by itself, however, is necessary but not sufficient to warrant reversal. We also must consider whether this error was harmless. *United States v. Annigoni,* 96 F.3d 1132, 1143 (9th Cir.1996) (en banc) (holding that a "classic 'trial error'" is subject to harmless error analysis). In so doing, we ask whether this error was "harmless beyond a reasonable doubt" or whether "there is a *reasonable possibility* that the error materially affected the verdict." *United States v. Rubio–Villareal,* 967 F.2d 294, 296 n. 3 (9th Cir.1992) (en banc) (internal quotation marks omitted); *see also* Fed.R.Crim.P. 52(a) (giving content to "harmless error" analysis, by providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded").

No witnesses—except Rivera—saw Alvarez at the Economy Inn. Only Rivera testified that Blanco told him that "El Negro" would deliver the drugs. As an undocumented alien, Alvarez would have likely faced great difficulties trying to rent a motel room, while Rivera had valid identification. Our examination of the record convinces us that a reasonable jury could conclude that Rivera signed the motel receipt, which would have helped Alvarez prove that he did not sell Rivera methamphetamine on September 28, 2001. This type of proof would have weakened Rivera's claim that Alvarez sold him the drugs. The only remaining evidence supporting Alvarez's conviction was his argumentative confrontation with Rivera at Blanco's home on October 16, 2001, in which he accused Rivera of working with the authorities and referred to doing a "favor" on "that day." This adverse evidence, without more, is not so powerful that the erroneous exclusion of the handwritten debriefing statement and the motel receipt was rendered harmless. We are

persuaded that a reasonable possibility exists that the error materially affected the verdict.

This error also affects Alvarez's substantial rights, as the handwriting comparison provided Alvarez with his only means to undermine, and perhaps discredit altogether, Rivera's testimony. Alvarez wanted to use the documents to prove that he did not participate in the drug transaction on September 28, 2001, at the Economy Inn; in fact, he wanted to show that he was never there that day. Alvarez theorized that Rivera was double-crossing the Government: He rented the motel room himself and concocted a story that Alvarez sold him the drugs.

For these reasons, we cannot conclude that the district court's error was harmless.

### CONCLUSION

The district court erred in failing to allow the jury to compare the motel receipt to Rivera's handwritten statement, and this error was not harmless. Accordingly, we REVERSE Alvarez's distribution conviction and VACATE the relevant portion of his sentence.

**REVERSED.**

---

missibility of this evidence under 403 in the first instance, we do not reach this question.