**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fred S. PANG, Defendant–Appellant.**

**No. 03–10032.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 2004.

Filed March 30, 2004.

Martin A. Schainbaum, San Francisco, CA, for the defendant-appellant.

Thomas Moore, Assistant United States Attorney, San Francisco, CA, for the plaintiff-appellee.

Before: TASHIMA, THOMAS, and SILVERMAN, Circuit Judges.

SILVERMAN, Circuit Judge:.

Defendant Fred S. Pang was charged in an information, and found guilty by a jury, of five counts of unlawful structuring of currency transactions, four counts of income tax evasion, and four counts of filing false tax returns. He was sentenced to twenty-four months imprisonment, and raises several arguments on appeal.

## I. THE VOLUNTARINESS OF PANG'S CONSENT TO ENTER HIS PREMISES AND OF THE STATEMENTS HE MADE TO THE IRS AGENTS

### A. FACTS

Pang owned and operated Sin Ma Imports, a wholesale company that sells cooking oils to restaurants and retailers. At around 9:00 A.M. on August 19, 1998, IRS Special Agent Kevin Caramucci and six other agents went to the offices of Sin Ma Imports, presented themselves at a locked iron security gate at the entrance, rang the bell, showed badges, and identified themselves. All of the agents wore business attire and carried concealed weapons. Pang unlocked the gate and allowed the agents to enter. Pang's wife Nancy escorted two agents to her office where they interviewed her. Two other agents interviewed Sin Ma employees.

Three agents stayed with Pang and interviewed him in an outer office. According to the agents, prior to commencing the interview, Caramucci read Pang the so-called "IRS Non–Custodial Statement of Rights Card."[1] Pang responded that he understood his rights and voluntarily agreed to answer questions. Pang was asked about his businesses practices and records. He responded to questions with explanations and examples and left his chair to get records to substantiate his responses. The agents remained seated until the interview was completed, about an hour later. At the conclusion of the interview, the agents gave Pang a list of documents they needed, and then left.

At the hearing on Pang's motion to suppress the statements he made to the agents, Pang testified that he was never read his rights and that he was coerced into talking to the agents or induced into doing so by the agents' deceit and misrepresentations. He also claimed that he was particularly vulnerable to intimidation, having been raised in Singapore where "brutal consequences befall those who do not accede to government actions," even

---

**1.** The card states:

[A]s a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws and related offenses.

In connection with my investigation of your tax liability or other matters, I would like to ask you some questions. However, first, I advise you that under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way.

I also advise you that anything which you say, and documents that you submit may be used against you in any criminal proceedings which may be undertaken.

I advise you further that you may, if you wish, seek the assistance of an attorney before responding.

Do you understand these rights?

though he and his wife have lived in the United States for nearly 40 years and are U.S. citizens.

The district court denied the motion to suppress. The court specifically found Pang not to be credible. The court also found that Caramucci read Pang the IRS warnings and that Pang's statements and his consent to the IRS agents to enter his premises were voluntary and not the product of coercion, fraud, or misrepresentation. The court also found "suspect" Pang's claim that he feared the agents. In any event, the court found that the agents did nothing improper.

### B. STANDARD OF REVIEW AND ANALYSIS

■■■ "We review de novo the district court's denial of a suppression motion. The district court's underlying factual finding that a person voluntarily consented to a search is reviewed for clear error." *United States v. Patayan Soriano*, No. 01–50461, 361 F.3d 494, 501, 2004 WL 439854, at *5 (9th Cir. Mar.11, 2004) (citations omitted); *see also United States v. Rosi*, 27 F.3d 409, 411 (9th Cir.1994) (addressing warrantless entry). The government bears the burden of proving that consent was freely and voluntarily given. *Patayan Soriano*, 361 F.3d 494, 2004 WL 439854, at *6. On appeal, we view evidence regarding the question of consent in the light most favorable to the fact-finder's decision. *Id.*

■■■ Having examined the record, we hold that the district court did not clearly err in finding Pang not credible. Likewise, the court did not clearly err in finding Pang voluntarily consented to the entry of his premises and voluntarily made the statements to the agents. *See United States v. Huynh*, 60 F.3d 1386, 1388 (9th Cir.1995).

## II. THE ADMISSIBILITY OF THE SIN MA INVOICES AND THE WO LEE CANCELLED CHECKS

The gist of the government's tax case was that Pang failed to fully report income derived from sales to six of Sin Ma Import's customers. Representatives of five of the customers testified at trial concerning how they conducted business with Sin Ma. However, the government was unable to procure the testimony of a representative of the sixth customer, Wo Lee Co. Consequently, the government sought to introduce into evidence documents obtained from Wo Lee without calling anyone from Wo Lee to authenticate them.

These documents consisted of original invoices issued by Sin Ma and corresponding original cancelled checks written on Wo Lee's bank account. Agent Caramucci testified that Wo Lee's owner, Ming Tzeu Chen, gave these documents to IRS Agent Charlie Busch, who in turn gave them to Caramucci. Pang objected to these invoices and checks on hearsay and foundation grounds. The district court found, and Pang does not dispute, that the invoices are identical to numerous other invoices that were already admitted into evidence. Many of the invoices matched up to carbonless copies of the same invoices contained in Pang's own records seized pursuant to a search warrant. Other invoices not matched with carbonless copies bore invoice numbers appearing in sequence with other invoices contained in Sin Ma's invoice book. The district court admitted these documents into evidence, but instructed the jury that it was the final arbiter of whether the documents were authentic.

### A. STANDARD OF REVIEW

■■■ We review for abuse of discretion a district court's finding that evidence is supported by a proper foundation. *United*

*States v. Tank,* 200 F.3d 627, 630 (9th Cir.2000). We may affirm an evidentiary ruling on any ground supported by the record, regardless of whether the district court relied on the same grounds or reasoning we adopt. *Atel Financial Corp. v. Quaker Coal Co.,* 321 F.3d 924, 926 (9th Cir.2003) (per curiam). Even if we find error, we will only reverse if an erroneous evidentiary ruling "more likely than not affected the verdict." *United States v. Angwin,* 271 F.3d 786, 798 (9th Cir.2001).

## B. ANALYSIS

### 1. The Cancelled Checks

■■ The Wo Lee checks did not require extrinsic evidence of authenticity. As a negotiable instrument, a check is a species of commercial paper, and therefore self-authenticating. *See* Fed.R.Evid. 902(9);[2] *United States v. Hawkins,* 905 F.2d 1489, 1494 (11th Cir.1990) (checks); *United States v. Little,* 567 F.2d 346, 349 n. 1 (8th Cir.1977) (same); *see also United States v. Carriger,* 592 F.2d 312, 316 (6th Cir.1979) (promissory notes).

■■ Pang also argues that the Wo Lee checks were hearsay. Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed R. Evid. 801(c). However, out-of-court statements that are offered as evidence of legally operative verbal conduct are not hearsay. They are considered "verbal acts." *Stuart v. UNUM Life Ins. Co. of America,* 217 F.3d 1145, 1154 (9th Cir.2000) (insurance policy); *United States v. Arteaga,* 117 F.3d 388, 395–98 (9th Cir.1997) (money wire transfer forms). Checks fall squarely

in this category of legally-operative verbal acts that are not barred by the hearsay rule. *See, e.g., Spurlock v. Comm'r of Internal Revenue,* 85 T.C.M. (CCH) 1236, 1240 (T.C.2003) ("A check is a negotiable instrument, a legally operative document, and falls within the category of 'verbal acts' which are excludable from the hearsay rule."); *United States v. Dababneh,* 28 M.J. 929, 935 (N.M.C.M.R.1989) ("[C]hecks themselves, together with the tellers' markings and routing stamps, ... are commercial events which create legal rights and obligations, and therefore no exception to hearsay need be found [to admit checks into evidence]".). Because the Wo Lee checks were self-authenticating and are not hearsay, the district court properly admitted them.

### 2. The Invoices

■■ Unlike checks, invoices are not self-authenticating under Rule 902(9). An invoice is an "itemized list of goods or services furnished by a seller to a buyer, usu[ally] specifying the price and terms of sale." Black's Law Dictionary 833 (7th ed.1999). It is not commercial paper, nor is it a document "relating thereto to the extent provided by general commercial law." Fed.R.Evid. 902(9). To the contrary, "general commercial law"—whatever *that* is (presumably the Uniform Commercial Code)—makes no provision for invoices. Therefore, the government, as the proponent of the invoices, was obliged to come forward with evidence sufficient to support a finding that the invoices were what they purported to be. This it did. The government showed, and Pang does not dispute, that the invoices were

---

**2.** Fed.R.Evid. 902(9) provides:
Rule 902. Self Authentication
Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
. . . .

(9) Commercial paper and related documents. Commercial paper, signatures thereon, and documents related thereto to the extent provided by general commercial law.

identical to other invoices that were received into evidence, that they were matched to carbonless copies of the same invoices in evidence, and that the numbers were in sequence with the numbers of other invoices that were in evidence. Furthermore, the invoices correlated dollar-for-dollar with the cancelled checks.

■ The authentication requirement is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). The proponent need not establish a proper foundation through personal knowledge; a proper foundation "can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774 (9th Cir.2002). Rule 901 allows the district court to admit evidence "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Tank,* 200 F.3d at 630. We agree with the district court that the government offered sufficient circumstantial proof that the invoices were what they purported to be. Therefore, the foundation was adequate.

■ The next question is whether the invoices were hearsay. They were not. When offered against Pang, Pang's invoices were admissions, and therefore non-hearsay as defined by Rule 801(d)(2).

## III. CONSTRUCTIVE AMENDMENT OF THE INFORMATION

■ With respect to the structuring counts, Pang argues that the information was constructively amended. We review de novo allegations that there was constructive amendment of an indictment, *United States v. Adamson,* 291 F.3d 606, 612 (9th Cir.2002), and we apply that same standard to an information. The information charged that Pang acted "knowingly and for the purpose of evading the reporting requirements." However, when it

came time to settle instructions, the court ruled that "knowingly" is not an element of the offense and that its inclusion in the information was surplusage. Consequently, the district court instructed the jury as follows: "To sustain a charge of unlawfully structuring a financial transaction ... the government must prove the following: First, that defendant structured or attempted to structure a transaction for the purpose of evading the currency transaction reporting requirements. And, second, that the transaction involved one or more domestic financial institutions."

31 U.S.C. § 5324(a)(3) provides: "No person shall, for the purpose of evading the reporting requirements of section 5313(a) [which requires banks to file currency transaction reports for any cash transaction exceeding $10,000] ... structure or assist in structuring ... any transaction...." In 1994, the Supreme Court held that conviction for structuring required proof that the "defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States,* 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). In response to *Ratzlaf,* Congress excepted violations of § 5324 from the penalty provisions of § 5322, which require willfulness, and added a penalty provision to § 5324 that did not require knowledge that structuring was illegal. Money Laundering Suppression Act of 1994, Pub.L. No. 103–325, § 411(a) and (c)(1), 108 Stat. 2160, codified at 31 U.S.C. §§ 5322(a), (b) and 5324(d). This eliminated the willfulness requirement imposed by *Ratzlaf. United States v. Ahmad,* 213 F.3d 805, 809 (4th Cir.2000); *see also United States v. Lindberg,* 220 F.3d 1120, 1122 n. 2 (9th Cir.2000) ("*Ratzlaf* has been superseded by statute"). After the amendments, the prosecution needs to prove "that there was an intent to evade the reporting requirement," but does not need to also prove "that the defendant knew that structuring

was illegal." H.R. Rep. 103–438, at 22 (1994).[3]

A constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime. *Adamson*, 291 F.3d at 614. That is not what occurred here. The jury was properly instructed on the elements of unlawful structuring of financial transactions. The district court did not err by refusing to instruct the jury to find an element that really isn't an element. The failure to include in the instructions surplusage from the information was not error because only the "essential elements" of the charge need be proven at trial. *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir.1986). In any event, Pang failed to show that he was ambushed or misled in any way by the extraneous language in the information.

## IV.  BELATED TAX PAYMENTS

Pang argues that the district court erred in preventing him from offering evidence that, while awaiting trial in this criminal matter, he paid the IRS $459,227.59, the amount due for the tax years in question. Pang proffered this evidence to demonstrate a lack of intent to wilfully "evade or defeat" the tax laws. We review for abuse of discretion the district court's decision to exclude evidence. *United States v. Alvarez–Farfan*, 338 F.3d 1043, 1045 (9th Cir.2003).

The district court correctly ruled that evidence of belated tax payments, made while awaiting prosecution, is irrelevant. *Sansone v. United States*, 380 U.S. 343, 354, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) (subsequent intention to pay taxes is no

defense to a past intention to evade taxes); *United States v. Ross*, 626 F.2d 77, 81 (9th Cir.1980) (same). Were the rule otherwise, tax evaders could avoid criminal prosecution simply by paying up after being caught.

## IV.  GRAND JURY SUBPOENA

Finally, Pang argues that the IRS abused the grand jury process by serving a grand jury subpoena on Pang's accountant when he declined to produce Pang's tax work papers. We review de novo alleged abuse of the grand jury process. *United States v. Fuchs*, 218 F.3d 957, 964 (9th Cir.2000).

On the day that Pang was visited by the IRS agents, two of the agents also called upon Pang's accountant, William Wan. Wan told the agents that he was in possession of work papers used to prepare Pang's tax returns. Wan left the room ostensibly to get the papers, but returned a few minutes later to tell the agents Pang's attorney had advised him not to voluntarily produce information without being served with a grand jury subpoena. The agents then served Wan with a grand jury subpoena. Later that day, Wan called one of the agents and agreed to voluntarily produce the subpoenaed records prior to the grand jury return date.

As we understand it, Pang's argument appears to be that the IRS agents misused the subpoena process to obtain information from Wan that they otherwise would not have gotten. We see no impropriety here. Nothing prohibits a subpoenaed grand jury witness from voluntarily consenting to an interview. *United States*

---

**3.** Pang was charged with unlawful structuring occurring in 1996, so the 1994 amendments apply.

*v. Duncan,* 570 F.2d 292, 293 (9th Cir. 1978) (per curam).

AFFIRMED.