# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

    v.

GINO GONZAGA RODRIQUEZ,
          *Defendant-Appellant.*

No. 04-30397

D.C. No.
CR-03-00142-RHW

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

    v.

GINO GONZAGA RODRIQUEZ,
          *Defendant-Appellee.*

No. 04-30494

D.C. No.
CR-03-00142-RHW

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, District Judge, Presiding

Argued and Submitted
January 23, 2006—Seattle, Washington

Filed October 5, 2006

Before: Johnnie B. Rawlinson and Richard R. Clifton,
Circuit Judges, and Consuelo B. Marshall,*
Senior District Judge.

Opinion by Judge Rawlinson

*The Honorable Consuelo B. Marshall, Senior United States District
Judge for the Central District of California, sitting by designation.

17293

## COUNSEL

Lana C. Glenn, Spokane, Washington, for appellant/cross-appellee Gino Gonzaga Rodriquez.

Joseph H. Harrington, Assistant United States Attorney, Spokane, Washington, for appellee/cross-appellant United States.

## OPINION

RAWLINSON, Circuit Judge:

A jury convicted Gino Rodriquez of being a felon in possession of a firearm. On appeal, he argues that the district court erred in denying his motion to suppress the firearm because consent to search was not voluntary. He also contends that there was insufficient evidence to support his conviction. On cross-appeal, the government maintains that the district court erroneously concluded that Rodriquez's prior drug convictions do not qualify as predicate offenses under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). We conclude that the search was conducted pursuant to a valid consent; there was sufficient evidence to support the jury's finding that Rodriquez possessed the firearm; and the district court — relying on *United States v. Corona-Sanchez*, 291 F.3d 1201 (9th Cir. 2002) (en banc) — correctly held that Rodriquez's prior drug convictions do not qualify as predicate offenses under the ACCA. We therefore affirm.

## I

### *FACTUAL AND PROCEDURAL BACKGROUND*

Gino Rodriquez has several felony convictions in Washington State, including three convictions for delivery of a con-

trolled substance. Rodriquez served his time and, upon his release, was placed on a term of community supervision, from which he absconded. He was subsequently placed on "escape status," and four warrants were issued for his arrest. His whereabouts were unknown until April 2003, when law enforcement officers located and arrested him.

Rodriquez was staying with Tammi Putnam in apartment 36 of an apartment complex in Spokane, Washington. Rodriquez had a key to the apartment, had access to the entire apartment, had his belongings there, and received mail there. Rodriquez and Tammi resided with Tammi's daughter and teenaged son, Zachary.

In March 2003, Zachary's friend, William Packer, spoke to Rodriquez about "getting rid" of a gun. Rodriquez told Packer that he could "get rid" of it. Packer brought the gun to the apartment for Rodriquez. Rodriquez looked at the gun, grabbed it with his shirt, pulled the gun out of the sleeve and replaced it. Rodriquez kept the gun, telling Packer that he would try to sell it. Zachary later observed Rodriquez in the apartment with the gun on a table. When Zachary asked about the gun, Rodriquez stated that he was "getting rid of it."

Meanwhile, a joint fugitive task force was looking for Rodriquez and conducting surveillance of Deanna Torgeson, whom the task force had learned was visiting Rodriquez on a regular basis. In April 2003, task force officers followed Torgeson to the apartment complex where Rodriquez resided. They observed Torgeson talking to Rodriquez right outside the rear, open door of apartment 36, while Rodriquez was eating a bowl of cereal.

Spokane County Sheriff Deputy Kris Thompson arrested Rodriquez pursuant to four outstanding warrants for his arrest. Deputy Thompson found a bag of heroin and approximately $900 dollars in cash when Rodriquez was searched. After Deputy Thompson administered the *Miranda* warnings, which

Rodriquez waived, Rodriquez denied living in apartment 36. Rodriquez also made other statements that, according to Deputy Thompson, "didn't quite match up," including conflicting stories about how he arrived at the apartment.

At this point, Tammi arrived on the scene. When Deputy Thompson asked her whether she lived in apartment 36 and whether she knew Rodriquez or Torgeson, she responded that she did not live in that apartment, she did not know Rodriquez or Torgeson, and she was at the complex to pick up her child. She then entered apartment 35.

After conversing with the resident of apartment 35, Deputy Thompson discovered that Tammi had not been forthright. He confronted Tammi with her earlier statements, which she confessed were false. He advised her that "it was a criminal offense to make a false or misleading statement to a public servant." During the course of their conversation, she seemed "nervous" and "upset." Deputy Thompson explained that Rodriquez had been arrested and told Tammi that a warrant could be obtained to search the apartment, in which case the apartment would be secured to ensure the integrity of its contents. Alternatively, she could consent to a search. Deputy Thompson informed Tammi that she had the right to refuse to consent and read to her a search consent card, which she reviewed, signed, and dated. Upon receiving her consent, the officers searched the apartment, where they discovered the gun underneath a couch.

Rodriquez was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He moved to suppress evidence seized during the search, asserting that Tammi's consent was not voluntary. The district court denied the motion, and Rodriquez was convicted by a jury.

Rodriquez also objected to the government's request that the judge enhance his sentence under the ACCA. He contended that his two prior burglary convictions and three prior

drug convictions did not qualify as predicate offenses under the ACCA. The district court concluded that Rodriquez's prior burglary convictions qualified as two predicate offenses; however, relying on *Corona-Sanchez*, the district court held that the ACCA enhancement did not apply because Rodriquez's prior drug convictions did not qualify as predicate offenses. This timely appeal and cross-appeal followed.

## II

### *DISCUSSION*

#### A. The Motion to Suppress Was Properly Denied Because Tammi Putnam Voluntarily Consented to the Search of Apartment 36

"We review de novo the district court's denial of a suppression motion. The district court's underlying factual finding that a person voluntarily consented to a search is reviewed for clear error." *United States v. Pang*, 362 F.3d 1187, 1191 (9th Cir. 2004) (citations omitted).

[1] "It is well settled that a search conducted pursuant to a valid consent is constitutionally permissible." *United States v. Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (citation and internal quotation marks omitted). "Whether consent to search was voluntarily given is to be determined from the totality of all the circumstances. It is the government's burden to prove that the consent was freely and voluntarily given. On appeal, evidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *Id.* (citations and internal quotation marks omitted).

[2] "Our cases have identified five factors to be considered in determining the voluntariness of consent to a search. They are: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified

that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Id.* at 502 (citations and internal quotation marks omitted). "No one factor is determinative in the equation. It is not necessary to check off all five factors, but many of this court's decisions upholding consent as voluntary are supported by at least several of the factors. Nevertheless, these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Id.* (citations and internal quotation marks omitted).

**[3]** Based on the totality of the circumstances and after considering the applicable factors, we conclude that Tammi voluntarily consented to the search. As to the first factor, the district court concluded, and Rodriquez conceded in his brief, that Tammi was not in custody when she consented to the search. Second, the court determined that there was no "indication that firearms were exhibited or drawn," a conclusion with which Rodriquez also agreed. Third, because Tammi was not in custody, "*Miranda* warnings were inapposite . . ." *Id.* at 504 (citation omitted). Fourth, the court found, and Rodriquez acknowledged, that Tammi knew she had the right to refuse consent. "Knowledge of the right to refuse consent is highly relevant in determining whether a consent is valid." *Id.* (alteration and citations omitted). Moreover, where, as here, "*the officers themselves* informed [Tammi] that she was free to withhold her consent," "the probability that their conduct could reasonably have appeared to her to be coercive" is "substantially lessened." *United States v. Mendenhall*, 446 U.S. 544, 559 (1980) (emphasis added).

**[4]** Fifth, Deputy Thompson told Tammi that, if she chose not to consent, he could apply for a search warrant and secure her apartment. A "statement indicating that a search warrant would likely be sought and the [apartment] secured could not have, by itself, rendered [Tammi's] consent involuntary as a matter of law." *United States v. Whitworth*, 856 F.2d 1268, 1279 (9th Cir. 1988) (citations omitted). Rather, application of this factor "hinges on whether [Tammi was] informed

about the possibility of a search warrant in a threatening manner." *Soriano*, 361 F.3d at 504 (citations omitted). "Even assuming, however, that [Deputy Thompson's statements] were made in a threatening manner so as to imply the futility of withholding consent, when probable cause to justify a warrant exists, the weight of the fifth factor is significantly diminished." *Id.* at 504-05 (citations omitted).

**[5]** Probable cause to justify a warrant existed in this case. "Probable cause exists when there is a fair probability or substantial chance of criminal activity. It is well-settled that the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search." *Id.* at 505 (citations and internal quotation marks omitted).

**[6]** Prior to the search, the officers knew the following: Rodriquez had absconded from his supervision, and there were four outstanding warrants for his arrest; he was found standing right outside an open door to an apartment eating a bowl of cereal; he denied residing at the apartment, but two people independently confirmed that he resided there; he provided an implausible explanation for how he arrived at the apartment; he attempted to distance himself from the apartment; and he was in possession of "a considerable size chunk of heroin" and approximately $900 dollars in cash. This collection of facts implies a fair probability of criminal activity resulting in probable cause, thereby significantly diminishing the weight of the fifth factor. *See id.*

The voluntary consent analysis does not automatically end here, however, because the five factors articulated in *Soriano* are not exhaustive. *Id.* at 502. In addition to the five factors, "execution of a consent form is one factor that indicates that consent was voluntary." *United States v. Childs*, 944 F.2d 491, 496 (9th Cir. 1991) (alteration and citation omitted). In this case, Tammi executed a consent form, reinforcing the conclusion that she voluntarily consented.

**[7]** In sum, the totality of the circumstances in this case leads us to conclude that the district court's finding that Tammi voluntarily consented to the search was not clearly erroneous. We therefore affirm the district court's denial of Rodriquez's motion to suppress.

## B.  There Was Sufficient Evidence to Support the Jury's Finding that Rodriquez Possessed the Firearm

"When reviewing convictions for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sanders*, 421 F.3d 1044, 1049 (9th Cir. 2005) (emphasis in the original) (citation and internal quotation marks omitted).

The evidence in the record reflects that Packer asked Rodriquez whether Rodriquez could "get rid" of the gun for him. Rodriquez responded that he could. Packer brought the gun to Rodriquez, who looked at the gun and handled it. After telling Packer that he would try to sell it, Rodriquez kept the gun. Zachary later observed Rodriquez in the apartment with the gun on a table. When Zachary asked about the gun, Rodriquez stated that "he was getting rid of it."

**[8]** The evidence also supports a reasonable inference that Rodriquez resided in the apartment in which the gun was discovered: officers observed Rodriquez standing outside an open door to the apartment eating a bowl of cereal; although he denied residing in the apartment, two people independently confirmed that he resided there; he had a key to the apartment; he had access to the entire apartment; he had belongings in the apartment; and officers found mail sent to Rodriquez at the apartment's address.[1]

---

[1]The fact that the gun was located under the couch "where numerous individuals had access and control" does not establish that Rodriquez did

**[9]** We conclude that the evidence at trial, viewed in the light most favorable to the prosecution, could lead a rational trier of fact to find beyond a reasonable doubt that Rodriquez possessed the firearm. *See United States v. Garcia-Cruz*, 978 F.2d 537, 542 (9th Cir. 1992) (holding that the defendant's sole admission that he had "the gun dropped off to [him] to pick up" was sufficient evidence of possession).

**C.  *Corona-Sanchez* Forecloses Use of Rodriquez's Prior Drug Convictions as Predicate Offenses Under the ACCA**

We review *de novo* whether a prior conviction "may be used for purposes of enhancement under the ACCA . . ." *United States v. Phillips*, 149 F.3d 1026, 1031 (9th Cir. 1998).

**[10]** Under the ACCA, a person who violates 18 U.S.C. § 922(g) and has three prior convictions for a "violent felony" or a "serious drug offense" is subject to a mandatory minimum sentence of fifteen years. 18 U.S.C. § 924(e)(1). One definition of a serious drug offense is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which *a maximum term of imprisonment of ten years or more* is prescribed by law . . ." 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added).

Rodriquez was previously convicted of three drug offenses in violation of Washington Revised Code § 69.50.401, the maximum penalty for which is five years' imprisonment.

---

not have possession of it; the evidence still reasonably supports the inference that he did. Rodriquez provided an implausible explanation for how he arrived at the apartment, denied living in the apartment, and stated that "he didn't have any belongings in apartment #36," all of which could lead a rational trier of fact to conclude beyond a reasonable doubt that he was attempting to distance himself from the apartment because he was aware that he had put the gun under the couch.

Wash. Rev. Code § 9A.20.021(1)(c). However, if a person is convicted of "a second or subsequent offense," the maximum penalty is ten years. Wash. Rev. Code § 69.50.408(1). The question, then, is whether the district court should consider the maximum penalty as provided in the five-year statute of conviction (which would *not* trigger the ACCA enhancement), or consider the maximum ten-year penalty resulting from the recidivism provision (which *would* trigger the ACCA enhancement).[2] The district court correctly applied our decision in *Corona-Sanchez*, concluding that it could consider only the five-year maximum penalty provided in the statute of conviction.

In *Corona-Sanchez*, we considered a similar issue: whether a defendant's prior conviction for petty theft under California Penal Code § 484(a) qualified as an "aggravated felony." 291 F.3d at 1208. To qualify as an aggravated felony, the term of imprisonment for the theft offense had to be at least one year. *Id.* On the face of California Penal Code § 484(a), the maximum possible sentence was six months. *Id.* However, the defendant "actually received a two year sentence . . . due to the application of California Penal Code § 666, which provides a sentence enhancement for recidivists." *Id.*

**[11]** In deciding *Corona-Sanchez*, we followed the "familiar analytical model constructed by the Supreme Court in *Taylor v. United States*, 495 U.S. 575, [600] (1990)." *Id.* at 1203. For federal sentencing enhancement purposes, when we consider the prison term imposed for a prior offense, "we must consider the sentence available for the crime itself, without considering separate recidivist sentencing enhancements."[3] *Id.*

---

[2]Neither party challenges the district court's determination that Rodriquez's two prior burglary convictions qualify as two predicate offenses under the ACCA. The only issue is whether Rodriquez's prior drug convictions qualify as predicate offenses.

[3]In general, federal courts apply this categorical approach to decide whether a defendant's prior conviction qualifies as a particular type of

at 1209 (reiterating that the court must examine the crime itself, "rather than any sentencing enhancements"); *see also United States v. Moreno-Hernandez*, 419 F.3d 906, 910 (9th Cir. 2005) (stating that, in *Corona-Sanchez*, the court held that "the substantive offense is to be considered independently of any recidivist sentencing enhancement."), *cert. denied*, 126 S. Ct. 636 (2005). We observed that this conclusion "is consistent with the Supreme Court's historic separation of recidivism and substantive crimes. As the Court bluntly put it, 'recidivism does not relate to the commission of the offense.' " *Corona-Sanchez*, 291 F.3d at 1209 (citations omitted).

**[12]** The rationale articulated in *Corona-Sanchez* applies equally in this case,[4] dictating the conclusion that the district court could consider only the maximum penalty as provided in the five-year statute of conviction, and not the maximum ten-year penalty resulting from the recidivism provision.

The government attempts to distinguish *Corona-Sanchez* on several bases, none of which are persuasive. The government first posits that, unlike *Corona-Sanchez*, where the petty theft statute (Cal. Penal Code § 484) and the recidivism provision (Cal. Penal Code § 666) were "wholly separate," the stat-

---

predicate offense (e.g., an "aggravated felony" or a "serious drug offense"), which, in turn, determines whether the defendant will receive an enhanced sentence. To decide whether a prior conviction counts as a particular type of predicate offense under the categorical approach, "federal courts do not examine the facts underlying the prior offense, *but look only to the fact of conviction and the statutory definition of the prior offense*." *Corona-Sanchez*, 291 F.3d at 1203 (emphasis added) (citation and internal quotation marks omitted). In *Corona-Sanchez*, we concluded that the categorical approach required us to "separate the recidivist enhancement from the underlying offense" and "consider the sentence available for the crime itself . . ." *Id.* at 1209-10.

[4]"We apply the categorical approach in a variety of sentencing contexts." *United States v. Piccolo*, 441 F.3d 1084, 1086 (9th Cir. 2006) (citation and internal quotation marks omitted).

utes in this case "are both in the same article . . . and are codified in fairly close proximity . . ." However, this distinction is not convincing because, in *Corona-Sanchez*, we concluded that "we must separate the recidivist enhancement from the underlying offense." *Corona-Sanchez*, 291 F.3d at 1210. We "must consider the sentence available for the crime itself, without considering separate recidivist sentencing enhancements." *Id.* at 1209. We observed that our conclusion is consistent with, and based on, the Supreme Court's historic separation of substantive crimes and recidivism, pertinent legislative history, and our own cases distinguishing between substantive offenses and recidivist sentencing enhancement statutes. *Id.* This rationale applies regardless of where the recidivist provision is located in the statutory framework. *Cf. United States v. Arellano-Torres*, 303 F.3d 1173, 1178 (9th Cir. 2002) (relying on *Corona-Sanchez* to disregard a sentencing enhancement located in the same section as the substantive offense).[5]

The government next argues that, in *Corona-Sanchez*, the issue was whether the defendant's prior conviction was for a "theft offense . . . for which the term of imprisonment is at least one year." *Corona-Sanchez*, 291 F.3d at 1204 (alteration, citation, and footnote reference omitted). The "theft offense" language, the government continues, suggests that Congress sought to include "only the punishment imposed for the theft offense itself." In contrast, according to the government, the issue in this case is whether Rodriquez's prior drug convictions were for "an offense . . . *involving* manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . ." 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added). The government contends that the language defining drug offenses is "more expansive and encompasses recidivist offenses . . ."

---

[5]The government concedes that "the logic of *Corona-Sanchez* does not appear to be confined to separately codified sentencing schemes . . ."

The government's reliance on the "theft offense" characterization is misplaced, however, because *Corona-Sanchez* did not rely on or attach any particular significance to that term. Rather, *Corona-Sanchez* focused on *the term of imprisonment for the theft offense* in determining whether a conviction for theft qualified as an aggravated felony. *See* 291 F.3d at 1208.

By urging us to conclude that the term "involving" is so broad as to "encompass[ ] recidivist offenses," the government is, in effect, contending that the drug offenses should be interpreted as subsuming corollary recidivism enhancements. That interpretation would effectively render "offense" and "sentencing enhancements" coterminous, a result that is foreclosed by Supreme Court precedent. *See Apprendi v. New Jersey*, 530 U.S. 466, 488, 496 (2000) ("[R]ecidivism does not relate to the commission of the offense.") (internal quotation marks omitted); *see also Rusz v. Ashcroft*, 376 F.3d 1182, 1185 (9th Cir. 2004) ("[S]entence enhancements . . . do not describe substantive criminal offenses . . .") (internal quotation marks omitted) (citing *Corona-Sanchez*, 291 F.3d at 1211); *Montiel-Barraza v. INS*, 275 F.3d 1178, 1180 (9th Cir. 2002) (per curiam) (holding that California Vehicle Code § 23175 [now § 23550, which provides an enhanced penalty for successive convictions for driving under the influence of alcohol,] "is an enhancement statute; it does not alter the elements of the underlying offense.") (citation omitted).

Finally, the government postulates that *Corona-Sanchez* applies only where the underlying offense is a misdemeanor and applying the recidivism provision would transform the misdemeanor into a felony. Because Rodriquez's prior drug offenses are already felonies, the government maintains, *Corona-Sanchez* does not apply, and the district court should have considered the maximum penalty applying the recidivism provision.

We disagree. *Corona-Sanchez* applies irrespective of the nature of the underlying crime of which a defendant is con-

victed. In *Corona-Sanchez*, we held that "a crime may be classified as an 'aggravated felony' . . . without regard to whether, under state law, the crime is *labeled* a felony or a misdemeanor." 291 F.3d at 1210 (emphasis in the original). In so holding, we agreed with our sister circuits that "it is irrelevant whether the state labels the underlying crime 'misdemeanor' or 'felony' . . . . The relevant question is whether the crime meets the definition of an 'aggravated felony' under federal sentencing law." *Id.* (citation and footnote reference omitted).

Likewise, Rodriquez's three convictions for delivery of a controlled substance may be classified as "serious drug offenses" "without regard to whether, under state law, the crime is *labeled* a felony or a misdemeanor." *Id.* As articulated in *Corona-Sanchez*, "it is irrelevant" whether Rodriquez's underlying crimes are misdemeanors or felonies; the relevant question is whether his prior drug offenses meet the definition of a "serious drug offense." *Id.* Under *Corona-Sanchez*, whether application of a recidivism enhancement would transform a misdemeanor into a felony is simply of no import.

However the government frames its argument, the essence of its request is that we consider the offense and the sentencing enhancement together. But that is precisely what is forbidden by *Corona-Sanchez* and its progeny. *See Moreno-Hernandez*, 419 F.3d at 911 ("*Corona-Sanchez* explained the cleaving of the recidivist enhancement from the underlying offense largely on the basis that the enhancement was measured by recidivism. Following the Supreme Court's reiteration . . . that 'recidivism does not relate to the commission of the offense,' the en banc court regarded petty theft as a single, substantive offense, as to which various sentencing alternatives were available depending on the defendant's past criminal history.") (citations and emphasis omitted).

**[13]** In sum, the government's distinctions cannot overcome the language in, or the rationale of, *Corona-Sanchez*. Based on *Corona-Sanchez*, the district court properly concluded that it could consider only the five-year maximum penalty provided in the statute of conviction. Because Rodriquez's prior drug convictions do not qualify as predicate offenses under the ACCA, the district court correctly declined to apply that enhancement.[6]

## III

### *CONCLUSION*

Because Tammi Putnam voluntarily consented to the search of apartment 36, the motion to suppress the firearm was properly denied. There was sufficient evidence presented during trial to enable a rational jury to conclude beyond a reasonable doubt that Rodriquez possessed the firearm. *Corona-Sanchez* applies in this ACCA case, dictating the conclusion that Rodriquez's prior drug convictions do not qualify as predicate offenses under the ACCA.

**AFFIRMED**.

---

[6]We recognize that this conclusion is in conflict with the Seventh Circuit's decision in *United States v. Henton*, 374 F.3d 467, 469-70 (7th Cir. 2004), *cert. denied*, 543 U.S. 967 (2004), and in tension with the Fifth Circuit's decision in *Mutascu v. Gonzales*, 444 F.3d 710, 712 (5th Cir. 2006) (per curiam), and the Fourth Circuit's decision in *United States v. Williams*, 326 F.3d 535, 539 (4th Cir. 2003). Nevertheless, *Corona-Sanchez* is binding Ninth Circuit precedent and dictates the conclusion we reach.